STATE OF MINNESOTA  )
                    ) ss. AFFIDAVIT OF JOHN T. MILLER
COUNTY OF RAMSEY    )

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Your Affiant has been a Special Agent with The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since August 2022. As an ATF Special Agent, your Affiant attended and successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I completed the ATF Special Agent Basic Training Program. I have been trained to conduct state and federal criminal investigations. I work as an ATF special agent in the Saint Paul Field Division, Group IV. I am currently assigned to the Hennepin County Violent Offender Task Force ("VOTF"). My duties include, but are not limited to, the investigation of violations of the federal firearms, arson, explosives laws, and other federal laws and regulations of the United States of America. In connection with his official ATF duties, I investigate criminal violations of federal firearms and narcotics laws. Prior to working with the ATF, I was a Steamboat Springs, Colorado Patrol Officer for over five years, as well as a Bayport, Minnesota Patrol Officer for over six years (2011-2017). During those years I worked as a patrol officer, school resource officer, enforcing state laws, and investigating criminal activity.

2. This affidavit is submitted for the limited purpose of establishing probable cause in support of issuing a complaint and arrest warrant charging Ohagi Charles WALKER with possession of ammunition by a felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8).

3. This affidavit is based on my personal knowledge, as well as information I have learned from other law enforcement officers and the review of reports, written materials, and recordings. This affidavit does not include all of the details I have learned regarding this investigation. Rather, it only includes information believed to be sufficient to establish probable cause.

## PROBABLE CAUSE

4. Working with multiple other state and federal agencies, the ATF and VOTF are investigating the "Lows" street gang. The "Lows" is a north Minneapolis criminal gang that engages in drug trafficking, firearm possession, and acts of violence. The Lows are comprised of gang subsets that go by different names, including the "Skitz Squad." The Lows are engaged in a violent rivalry with the Highs, another Minneapolis criminal gang that engages in drug trafficking, firearm possession, and acts of violence.

5. On July 30, 2023, VOTF members were asked to assist the Minneapolis Police Department (MPD) with a focused enforcement detail in the City of Minneapolis. A homicide had occurred the night before in which a member of the Lows was shot and killed by members of the Highs. In the past,

such shootings have led to violent retaliation by the gangs. Additionally, an officer of the MPD Gun Investigation Unit told VOTF that a confidential reliable informant (CRI) had stated that the Lows planned on a retaliatory act of violence. The CRI indicated that WALKER was on social media and using his cell phone to encourage other gang members to "get outside and get active." WALKER is known by law enforcement to be a leader of the Skitz Squad who has made multiple past postings taunting rival gangs. These postings are believed to have resulted in shootings and homicides in North Minneapolis. In my training and experience, and based on conversations I have had with colleagues in law enforcement who have investigated Minneapolis street gangs, this appears to be a call to commit acts of violence against members of the Highs. The CRI also indicated that WALKER would be driving a red Chrysler 300 with yellow claw marks over the headlights.

6. At about 10:30 p.m., during the course of the focused enforcement detail, the CRI informed police officers that there was a candlelight vigil for the decedent in the area of Medicine Lake Park in Plymouth, Minnesota. An HCSO detective drove to the scene: in their training and experience, members of criminal street gangs use such vigils as locations to gather and then set out to retaliate against rival gang members. At about 10:45, officers found a large group of people and about 20 vehicles in the parking lot of Medicine Lake Park.

7. Additional marked and unmarked law enforcement vehicles arrived on scene. Officers identified members of the Lows at the park. They also found a red Chrysler 300 matching the description provided by the CRI as WALKER's vehicle.

8. At about 11:10 p.m., officers saw six or seven vehicles leave the parking lot at high rate of speed, failing to stop at a stop sign leaving the park. The vehicles then all proceeded south on West Medicine Lake Blvd., going well above the posted speed limit. The vehicles turned south on West Medicine Lake Drive. An HCSO detective in an vehicle with subdued markings caught up to the vehicles, and smelled marijuana coming from the line of vehicles. The detective noted that the odor was powerful enough that he could smell it with the windows rolled up.

9. The vehicles stopped at the stoplight at West Medicine Lake Drive and Highway 55. The vehicles were in the left lane to turn east on Highway 55 toward North Minneapolis. The detective saw the red Chrysler 300 toward the front of the line. The detective could see that the tint of the windows of the vehicle appeared to be well above that allowed under Minnesota law.

10. When the light turned green, all the vehicles sped off. The detective caught up to the red Chrysler 300, which had taken the lead of the vehicles. The detective estimated that the Chrysler 300 was going approximately 85 and 95 miles per hour in a 55 zone.

11. The detective caught up to the Chrysler 300 and activated his emergency lights to initiate a stop on Highway 55 near the intersection of General Mills Blvd. The vehicle was slow to stop—it moved moving slowly over to the right side of the road but continue moving. The detective activated his siren, and followed with lights and siren for approximately 20 seconds. This was a source of concern for the deputy: in his training and experience, individuals who are slow to stop are often using the time to conceal or destroy evidence of crimes, including hiding firearms.

12. The vehicle finally pulled over near the intersection of Boone Avenue North and Highway 55. HCSO detectives approached the driver's side door. The driver, later identified to be WALKER, had his window rolled down approximately six inches. The lead detective could smell marijuana coming from the vehicle. The detective saw two additional passengers: a man in the front passenger seat with the initials R.C., and another man in the rear passenger-side seat with the initials A.W.

13. The deputy asked WALKER to turn his vehicle off and step out of the vehicle for officer safety. The deputy was aware that WALKER had an extensive criminal history, including a history of acts of violence and firearm possession. WALKER was slow to comply, and at one point he hesitated, leading detectives to believe he was going to sit back down again. A detective grabbed WALKER's arm, took WALKER's cell phone out of his hand, and

assisted in detaining him. A detective performed a pat-frisk of WALKER and did not find anything. The detective then directed WALKER to walk to the deputy's squad car. Other detectives on scene directed the other passengers to exit the vehicle as well.

14. Detectives then searched the vehicle. Under the driver's seat where WALKER was sitting, detectives found a Polymer 80 .40 caliber pistol without a serial number. These firearms are sometimes referred to informally as "ghost guns." The firearm had an extended magazine that was loaded with CBC .40 caliber ammunition. Detectives concluded that the firearm was WALKER's. Based on the position of the occupants in the vehicle, WALKER would have had easiest and most ready access to the area under his seat. Additionally, R.C. and A.W. are much younger than WALKER, with less criminal history and less influence in the Lows than WALKER. In their training and experience, consistent with my training and experience and with conversations I have had with colleagues in law enforcement, it is very unlikely that a gang leader like WALKER would allow either of his passengers to stow a gun under his seat while being stopped by law enforcement officers.

15. WALKER and the other two occupants of the vehicle were arrested and transported to the Hennepin County Jail. After rights advisement and waiver, WALKER acknowledged that the Chrysler 300 was his, and said he never gives rides to other people. He refused to say who the firearm belonged

to.

16. Detectives took DNA buccal swabs from all three occupants of the vehicle. A DNA analysis is pending.

17. A review of WALKER'S criminal history indicated that he previously been convicted of the following crimes, both of which were punishable by imprisonment for a term exceeding one year:

- Possession of a firearm after being convicted or adjudicated delinquent for a crime of violence, 2017, Hennepin County; and

- Fleeing a police officer in a motor vehicle, 2014, Hennepin County.

18. WALKER received sentences in excess of one year for these offenses.

19. A preliminary analysis by an ATF interstate nexus expert has concluded that the CBC .40 caliber ammunition was not manufactured in the State of Minnesota.

20. Based on the information set forth above, there is probable cause to believe that Ohagi Charles WALKER violated Title 18, United States Code, Sections 922(g)(1) and 924(a)(8) by possessing ammunition as felons.

7

Further your Affiant sayeth not.

_____
John T. Miller
Special Agent, ATF

SUBSCRIBED and SWORN before me
by reliable electronic means via FaceTime
and email pursuant to Fed. R. Crim. P. 41(d)(3) on
August 1, 2023:

_____
ELIZABETH COWAN WRIGHT
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MINNESOTA

8